IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARGARET GREEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 12 CV 07710 |
| v. | ) |
| | ) Hon. Sharon Johnson Coleman |
| SANFORD-BROWN COLLEGE INC., | ) |
| and CAREER EDUCATION | ) |
| CORPORATION | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Margaret Green, filed a complaint alleging discrimination based on her pregnancy pursuant to the Pregnancy Discrimination Act of 197, against her prior employer, Sanford-Brown College ("Sanford-Brown"). Sanford-Brown moves for summary judgment [36], arguing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. For the reasons set forth below, the Court grants summary judgment in favor of Sanford-Brown.

**Background**

The following facts are undisputed. Sanford-Brown College hired Green as an "Admissions Representative" in November 2010. She was pregnant for the duration of her employment. Green gave birth in early July 2011 and was discharged from employment on August 10, 2011, while she was on maternity leave.

Green worked in the Admissions Department, which is responsible for the Sanford-Brown's admissions process, including recruiting and enrolling prospective students and assisting those students once they begin classes. Sanford-Brown calls prospective students "leads." Leads are generated when a prospective student responds to Sanford-Brown's internet solicitations, calls the school directly, or appears in person at the school. Leads are considered "hot" when they are first

1

received. An Admissions Representative is required to enroll and start a certain number of students on a monthly basis, and the Representative's performance is measured by, among other factors, her success in meeting those goals.

Admissions Representatives who repeatedly fail to meet their goals are placed on a Performance Improvement Plan ("PIP"). Sanford-Brown does not enforce its recruitment objectives during the first 90-days of employment for Admission Representatives because most will not immediately achieve their enrollment or start goals. Therefore, no Admissions Representative has been placed on a PIP for not meeting their numbers during their first 90 days of employment. November 2010 to January 2011 was the first 90-days of Green's employment with Sanford-Brown.

Green did not meet her enrollment or start goals in February, March, or April of 2011. On April 26, 2011, she was placed on a 60-day PIP. The PIP outlined specific tasks and work strategies to assist Green with achieving her enrollment and start objectives and other performance expectations. The PIP also stated, "If your performance does not improve, we will take additional actions, up to and including, terminating your employment with the company," and "This plan is not intended to provide a promise of continued employment for any specific duration. Further, if we do not observe adequate effort or commitment on your part, we may amend the timeframe and/or parameters for evaluating your progress or discontinue the plan altogether."

Even before Green was put on PIP, her supervisors were trying to help her improve her performance. She met and spoke with Scott Lesht, who was serving as the interim Director of Admissions ("Director") about her performance. Lesht offered suggestions for improvements and suggested that she reach out to Human Resources Business Partner, Paul Young, and Regional Vice President of Admissions, Gilbert Polanco, to discuss her performance. Green met with Polanco and he advised her about how to talk to prospective students and discussed phone scripts with her. Green also received various training sessions throughout her employment including sessions on

2

March 29, April 13, April 26, April 29, and May 6, 2011. Green admits that despite these training sessions she was still having problems meeting her start and enrollment goals.

Green informed Sanford-Brown that she was due to give birth on July 8, 2011. She informed Sanford-Brown that she was going to take maternity leave early and that the 26th or 27th would be her last day of work. Sanford-Brown terminated Green's employment while she was on maternity leave. On August 10, 2011, Green received a call informing her that her employment was being terminated.

**Legal Standard**

Summary judgment is appropriate if the evidence shows that there is "no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the "initial responsibility" to show that there is no genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) but the Court must view all facts and make all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To avoid summary judgment, the non-moving party must provide enough factual evidence to show there is a genuine issue of material fact that warrants a trial. *Warren v. Solo Cup Co.*, 516 F.3d 627, 629 (7th Cir. 2008). Defeating summary judgment requires more than "some metaphysical doubt as to the material facts," and "neither speculation nor generic challenges to a witness's credibility are sufficient to satisfy this burden." *Trentadue v. Redmon*, 619 F.3d 648, 652 (7th Cir. 2010).

**Discussion**

Title VII prohibits employment discrimination on the basis of sex and was amended by Congress in 1978 to include the PDA, which extends protection to pregnant women. 42 U.S.C. § 2000e(k); *Serednyj v. Beverly Healthcare*, LLC, 656 F.3d 540, 547 (7th Cir. 2011). "The PDA created no new rights or remedies, but clarified the scope of Title VII by recognizing certain inherently gender-

specific characteristics that may not form the basis for disparate treatment of employees." *Hall v. Nalco Co.*, 534 F.3d 644, 647 (7th Cir. 2008). Therefore, Green's claim of pregnancy discrimination is within the protections against sex discrimination, *Hunt-Golliday v. Metro. Water Reclamation Dist.*, 104 F.3d 1004, 1010 (7th Cir. 1997), and the legal analysis is the same as a sex discrimination allegation. *Serednyj* 656 F.3d at 547. Green must prove pregnancy discrimination either by a direct or indirect method of proof. *Rhodes v. Illinois Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004).

## I. Direct Evidence Test

Sanford-Brown argues that there is no direct evidence of pregnancy discrimination in the record. In order to show direct discrimination Green can present direct or circumstantial evidence that would allow a jury to conclude the discrimination motivated an adverse employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). This type of evidence is not common and usually constitutes something similar to an "explicit admission by the employer that a particular decision was motivated by discrimination." *Diaz*, 653 F.3d at 587.

Here, Green does not argue there was an "explicit admission" of discrimination, but instead asserts that there is enough circumstantial evidence in the record for the trier of fact to infer intentional discrimination. A plaintiff may establish direct evidence of discrimination by presenting "a convincing mosaic of circumstantial evidence" from which a reasonable juror could infer the employee was fired because she was a member of a protected class. *Dass v. Chi. Bd. of Educ.*, 675 F.3d 1060, 1071 (7th Cir. 2012) (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). Green must provide circumstantial evidence that "'point[s] directly to a discriminatory reason for the

4

employer's action.'" *Serednyj*, 656 F.3d at 548 (quoting *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003)).

The Seventh Circuit has identified different types of circumstantial evidence that can point to intentional discrimination. *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 720 (7th Cir. 2008). One type of this circumstantial evidence "consists of suspicious timing, ambiguous statements [that are] oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . ." *Id.* Another type is evidence that shows similarly situated employees, outside the protected class, have received systematically better treatment. *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007). If Green can show one of these two types of circumstantial evidence, that is sufficient enough to show intentional discrimination. *Id.* However, she may also use "bits of circumstantial evidence… to compose a convincing mosaic of discrimination" to prove discrimination under the direct method. *Id.*

Green points to the following facts as circumstantial evidence of direct discrimination: (1) she was given fewer "hot" leads than non-pregnant Admissions Representatives; (2) she was held to a higher standard than non-pregnant Admissions Representatives; (3) she was placed on a PIP for not meeting her enrollment and start goals, while non-pregnant Admissions Representatives were not placed on a PIP despite failing to reach the same enrollment and start goals at the very same time as Green; (4) Goldberg, her supervisor, openly commented on how "gross" her pregnancy was and how she hoped she wasn't around when Green's water broke; and (5) she was terminated for not meeting her enrollment and start goals, while non-pregnant admissions representatives were not. However, these facts fail to establish direct discrimination.

Green claims she was given fewer "hot" leads than non-pregnant admissions representatives. Green admits that leads are considered "hot" when they are first received and therefore a

5

representative would have to be in the office to receive them. She explained that leads turn "cold after a certain amount of time and so the sooner [an admission representative] get[s] in touch with the student, the better."(Dkt. 38-3, Ex. B, Green Dep. at 77:14-78:7). There is no documentation of "hot leads," but Green admits that in March 2011, she had more leads than three of the seven other Admissions Representatives and, in April 2011, she had more leads than four of the seven other Admissions Representatives. (*Id.* at 79:20-80:16, 82:7-86:7) Green also admits that admissions representatives were expected to work some Saturdays each month and that she requested off work fourteen days from April 30, 2011, through June 26, 2011, including every Saturday in May. In May and June, Green had fewer leads than all but one of the other six Admission Representatives. (Dkt. 41-3, Ex. B at CEC GREEN 00171-76). Therefore, throughout her employment at Sanford-Brown Green was always ahead of at least one Admissions Representative in the number of leads she received.

Next, Green contends that her supervisor, Goldberg, made verbally harassing statements about her pregnancy. A remark can suggest discrimination when it "was (1) made by the decision maker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). However, "[i]solated comments, that are no more than 'stray remarks' in the workplace, are insufficient to establish that a particular decision was motivated by discriminatory animus." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 694 (7th Cir. 2006).

Green points to one instance where Goldberg made discriminatory remarks about her pregnancy and claims that Goldberg made the decision to terminate her employment. Green testified that Goldberg made the following remarks: "oh, my God, that's so gross, that's gross, like go, like no" in reference to her baby kicking; "I really hope you don't – your water doesn't break here, ew, ew"; she called the pregnancy "icky"; and said, "how far along are you . . . [and] you're

6

getting really big." (Dkt. 38-3, Ex. B, Green Dep. at 121:2-7; 182:10-16). Although Green claims that Goldberg made the decision to terminate her employment, there is no support for that assertion. *See Rogers,* 320 F.3d at 754 (explaining a decision maker is the person "responsible for the contested decision").

Green's assertion that Goldberg was the decision maker in her termination is based on Goldberg's deposition testimony that she "was involved in the process," and that it was a "universal" decision. Yet, Goldberg further described her role in the decision: "I know within my scope I submitted the data and her performance improvement plan. And beyond that, I don't know the specifics. I wasn't part of it." (Dkt. 38-4, Ex. C, Goldberg Dep. at 57:20-58:2). Green also relies on Human Resources Business Partner Paul Young's testimony. Young's testimony however does not imply Goldberg was the decision maker. Instead, he details conversations with Goldberg regarding Green's performance, her request for maternity leave, and how they needed to consider these issues separately. There is no evidence that Goldberg made any recommendations or that anything Goldberg may have said was the reason for Green's termination. *See Id.* (stating if there was competent evidence that the decision makers had acted as the supervisor's "cat's-paw" and rubber-stamped his recommendation for the adverse employment action, the court would consider the decision maker to be the decision maker).

There is also no evidence that Goldberg's statements about Green's pregnancy were related in any manner to her termination. In fact, Green cannot recall when Goldberg made the comments about her pregnancy or whether they were contemporaneous with her termination. In *Dass v. Chicago Board of Education,* the Court found the defendant's alleged comment "was not contemporaneous to or causally related to the discharge" and, even though there was no doubt that the defendant wanted to terminate the plaintiff's employment, the plaintiff's evidence did not create a genuine factual issue as to whether the defendant was motivated by national origin discrimination

7

rather than plaintiff's admitted inability to maintain discipline in her classroom. 675 F.3d at 1072. The Seventh Circuit has concluded that comments made even two months before the challenged adverse employment action fail to create a reasonable inference of discrimination. *See Petts*, 534 F.3d at 722 (citing *Markel v. Bd. of Regents of Univ. of Wis. Sys.*, 276 F.3d 906, 910-11 (7th Cir. 2002)) (finding supervisors' statements made "nearly two months" before employee's termination were not contemporaneous to the termination and thus were not evidence of discrimination). Although the Court is not unsympathetic to the potentially hurtful comments, Green cannot show they were related to the decision to terminate her employment. Green therefore fails to show unlawful discrimination through the direct method.

*II. Indirect Method*

Sanford-Brown argues that Green cannot establish a *prima facie* case of discrimination because she admits that for the majority of her employment she did not meet the minimum expectations of the job and she cannot point to any similarly-situated non-pregnant Admissions Representatives where were treated more favorably. To succeed under the indirect method, Green must establish a *prima facia* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). Green must prove that (1) she is a member of a protected class; (2) she performed her job to meet expectations; (3) she suffered an adverse employment action; and (4) she was treated differently than individuals who were similarly situated but outside her protected class. *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). However, summary judgment is appropriate in favor of Sanford-Brown if Green cannot demonstrate any one element of the prima facie case. *Lewis v. City of Chicago*, 496 F.3d 645, 652 (7th Cir. 2007).

If Green establishes a *prima facie* case of discrimination, the burden shifts to Sanford-Brown to articulate a legitimate, nondiscriminatory reason for her termination. *McDonnell Douglas Corp.*, 411 U.S. at 802. If Sanford-Brown satisfies this burden of production, Green must then establish that

there is an issue of material fact as to whether Sanford-Brown's "proffered reasons are merely pretext for unlawful discrimination or retaliation, in order to survive summary judgment." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004).

There is no dispute that Green was a member of a protected class and she suffered an adverse employment action. Therefore, all she needs to establish are the second and fourth prongs of her *prima facia* case. "The 'legitimate expectations' element in the ubiquitous burden-shifting formula of *McDonnell Douglas* [is crucial]." *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1179 (7th Cir. 1997). If a plaintiff fails to demonstrate that she was meeting her employer's legitimate employment expectations at the time of her termination, the employer may not be "put to the burden of stating the reasons for [her] termination." *Id.* If the plaintiff has direct evidence of discrimination "well and good; but if he has nothing else, and is therefore totally reliant on the *McDonnell Douglas* formula, he is out of luck if he can't show that he was meeting his employer's legitimate expectations." *Id.*

The undisputed facts demonstrate that Green did not meet Sanford-Brown's legitimate expectations at the time of her termination. The Admissions Representatives had monthly enrollment goals of ten and start goals of six. Green did not meet either of these goals in February, March, April, May, or June 2011. Thus, she cannot prove the second element of her *prima facie* case. The Court could conclude its analysis here and grant summary judgment in favor Sanford-Brown. However, Green argues that in order to properly assess whether she was meeting Sanford-Brown's expectations, the Court must look to the expectations placed on other admissions representatives during Greens employment. "When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge--allowing the plaintiff to establish a prima facie case, stave off summary judgment for the time being, and proceed to the pretext inquiry." *Peele v. Country Mut. Ins. Co..* 288 F.3d 319, 329 (7th Cir. 2002).

9

Green cannot show disparately applied employment expectations. In disciplinary cases, such as this, where the "plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on a prohibited reason, a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). The plaintiff usually needs to show the two employees had the "same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 618. However, a "precise equivalence" is not required. *Coleman v. Donahoe*, 667 F.3d 835, 850 (7th Cir. 2012).

Green asserts that Laura Sherman and Scott Whitcomb are similarly situated employees who were treated more favorably. Sherman was placed on PIP in May 2011 for not meeting her enrollment and start goals. Green argues that if they were held to the same standards, Sherman should have been placed on PIP in April, at the same time as Green. Even though two employees do not have to be identical, Green must show that the other coworker had a "comparable set of failings." *Burks v. Wis. DOT*, 464 F.3d 744 (7th Cir. 2006). The record demonstrates that Green and Sherman did not have a comparable set of failings. Sherman met her start goal in both February and March, where Green failed to meet both her enrollment and start goals for February, March, or April. (Dkt. 38-3, Green Dep., Ex. 13 at CEC GREEN 000171). Therefore, Sherman is not a similarly situated employee.

Green also claims she was held to a higher standard than Scott Whitcomb. This Court disagrees. Whitcomb was placed on PIP in February 2011 after not meeting his goals. After Sanford-Brown placed Whitcomb on PIP, he met his enrollment goals in April. (Dkt. 42-6, Ex. E at CEC GREEN00171-76). He was then removed from PIP. Therefore, unlike Green, Whitcomb did not fail to meet *both* his enrollment and start goals during his PIP.

10

Sanford-Brown argues that Green ignores two non-pregnant Admissions Representatives who missed both enrollment and start goals for three consecutive months and were consequently terminated on May 24, 2011. In *Bosley v. Rush Prudential Health Plans*, the Seventh Circuit upheld the district court's finding that the plaintiff was unable to establish a *prima facie* case of race discrimination where evidence established that similarly situated white employees were treated the same as the plaintiff. No. 99–3669, 2000 WL 622883, at *4 (7th Cir.2000). Sanford-Brown also contends, if anything, Green was treated more favorably since one of the non-pregnant Admissions Representatives was only placed on a thirty day PIP prior to termination, which is less than Green's sixty day PIP. This Court therefore finds that Green cannot prove that similarly situated non-pregnant employees were treated more favorably.

Even if Green could establish a *prima facie* case of discrimination, Sanford-Brown has articulated nondiscriminatory reasons for terminating her employment, including a history of performance deficiencies and an inability to demonstrate sustained improvement despite Sanford-Brown's efforts to provide support and training sessions. Green is unable to show that these reasons were pretext for discrimination. *Burks*, 464 F.3d at 754. In order to be pretextual, the proffered reasons must be a "lie or completely lack[ing in] a factual basis." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000). "Showing pretext requires '[p]roof that the defendant's explanation is unworthy of credence.'" *Filar v. Board. of Education*, 526 F.3d 1054, 1063 (7th Cir. 2008) (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)).

The record plainly reflects Sanford-Brown's repeated warnings to Green about her unsatisfactory work performance. Green was put on PIP for not meeting her goals. She continued to not meet expectations even after training sessions and advice from her superiors. There is nothing in the record to indicate that Sanford-Brown is lying to cover up some illegal discrimination. Sanford-Brown gave Green sufficient opportunity to improve her performance and attempted to

work with her to resolve her performance problems before determining that Green's work did not merit continued employment. Thus, Green has failed to demonstrate that Sanford-Brown's proffered reason for firing her is a pretext for discrimination. This Court therefore grants summary judgment in favor of Sanford-Brown.

**Conclusion**

For the reasons stated herein, the undisputed facts demonstrate that no genuine material issue of fact exists and Sanford-Brown is entitled to judgment as a matter of law. This Court grants the motion for summary judgment.

IT IS SO ORDERED.

Date: May 7, 2014

Entered _____
United States District Judge